AUGUST GRAVEMAN, Appellant, v. EDWIN F. HUNCKER, LOUISE K. HUNCKER, J. GEORGE DIEHR, JULIA EMMONS and AUGUST WILHELMINA SANDHAUS.—139 S. W. (2d) 494.

Division Two, May 4, 1940.

*John E. Corvey* and *Wilbur Schwartz* for appellant.

1208

*Wm. Waye, Jr.,* and *B. H. Dyer* for respondents.

COOLEY, C.—Action in equity to set aside deeds of trust on real estate and trustee's deeds made in foreclosure thereof, on the ground of fraud as against a creditor. The suit was filed September 13, 1933, in the St. Charles County Circuit Court, in which county the lands affected are situated. It went on change of venue to the circuit court of Franklin County, where it was tried, resulting in a judgment for the defendants, from which plaintiff has appealed.

Prior to the alleged fraudulent conveyances the real estate in question belonged to Edwin F. Huncker. Louise K. Huncker was his wife. [We are informed by papers filed here that Edwin F. Huncker has died since argument and submission of the case in this court and substitution of parties has been here made, so we shall refer to him as a party defendant.] Defendant Diehr was trustee in the deeds of trust involved and as such sold the properties, having no other interest in the case. Defendant Julia Emmons was named as payee in the notes secured by the deeds of trust and as *cestui que trust* in the

deeds of trust. She has and claims no interest in the controversy here involved, as will more fully appear hereafter. Augusta Sandhaus holds a note secured by deed of trust on some of the property involved, the bona fides of which does not seem to be seriously disputed.

Plaintiff, Graveman, filed a suit for damages for personal injuries against Edwin F. Huncker on July 1, 1931, which eventually resulted in a judgment in his favor of $6500 on May 3, 1933. The deeds of trust above mentioned, through foreclosure of which defendant Louise Huncker now claims title, were executed while Graveman's suit was pending. Said Louise knew of the pendency of said suit. After obtaining his judgment Graveman made ineffectual efforts to collect, Edwin F. Huncker having then no property in his name subject to execution, and this suit followed.

Plaintiff's second amended petition, on which the case was tried, charges that Edwin F. Huncker, with intent to hinder, delay and defraud his creditors, particularly plaintiff, while plaintiff's suit was pending, entered into a fraudulent scheme with his wife, Louise, and with the knowledge and consent of the other defendants, to voluntarily transfer all of his property, indirectly, to said Louise, said scheme consisting of the making of five deeds of trust, described in the petition, covering all of said Edwin F. Huncker's real estate; that in all of said deeds of trust said Edwin and Louise were grantors, Diehr was trustee and Julia Emmons was *cestui que trust*; that said deeds of trust ostensibly secured large sums of money, beyond the value of the properties involved, allegedly due from Edwin F. Huncker to Miss Emmons, when in fact he owed her nothing, and that they were without consideration and rendered said Edwin F. Huncker insolvent. There are further allegations as to subsequent foreclosure by Diehr as trustee and purchase by Louise Huncker at the foreclosure sales, through which she now claims title subject to prior encumbrances.

The petition, while first alleging that there were five deeds of trust, later describes a sixth. They appear in appellant's abstract as his Exhibits 7, 8, 9, 10, 11 and 12. All were dated October 24, 1931, except Exhibit 8, which was dated February 6, 1932, but purported to secure two notes, one of $12,000 and one of $1800, dated October 24, 1931. The deeds of trust in all covered all the real estate owned by Edwin F. Huncker, some purporting to be first liens, others subject to prior encumbrances. The foreclosures through which Louise Huncker claims title were of Exhibits 8, 9 and 11. Exhibit 7 (not foreclosed) secured two notes of Edwin F. Huncker, one for $5000 and one for $3000.

Exhibit 8 (foreclosed) secured two notes of Huncker, one for $12,000 and one for $1800 subject to a prior encumbrance to the St. Charles Building & Loan Association of $3000. Exhibit 9 (foreclosed) secured Huncker's note of $2000 subject to prior encumbrance of

$8000. [Note,—the above mentioned $12,000 and $2000 notes were assigned to Louise Huncker and are the ones here principally involved.]

Exhibit 11 (foreclosed) secured a $12,000 note of Huncker, of even date, subject to prior encumbrances of $9000 and $6800. [Note,—we have referred to two $12,000 notes. There seems to be some confusion here. We shall speak of this hereafter.]

All of the notes secured by the various deeds of trust were executed October 24, 1931, and were made payable to Julia Emmons, who then was working in her father's abstract office. According to her deposition, introduced by plaintiff, she drew up the papers and at Mr. Huncker's request wrote her name as payee in the notes, endorsed them "without recourse" and delivered them to Mr. Huncker. She said "the reason he asked me to put my name in as beneficiary was that he was not sure which fund he was going to take the money from;" that he was trustee of several estates and was not sure which fund or funds he would take the money from. Miss Emmons (now Mrs. Keithley) and Mr. Huncker had known each other and had worked together in the same office a number of years. He owed her no money and she received nothing and paid nothing on the notes. So far as she was concerned she may be regarded as a mere "straw party." At the time the notes were thus endorsed by Miss Emmons and delivered to Huncker it was understood that he would write in the names of the parties they were to go to and deliver them to such parties. Huncker delivered the $12,000 note and the $2000 note to his wife, Louise. Huncker had been guardian and curator of one Henry Ermeling, insane, and according to his testimony, had, individually, borrowed money from himself as curator, which he individually owed to himself as curator, or in other words, to the estate. The $9000 note above mentioned and, as we understand the record, the $5000 note were assigned to Huncker as such curator and they or renewals thereof are now in the hands of Huncker's successor in that trust (he having resigned as such guardian and curator before this suit was tried). At least he, individually, owed those debts. The $1800 note went to Huncker as trustee of the Ell estate, to which he, individually, owed the money. The other notes, excepting the $12,000 and $2000 notes, went to other persons who appear to have had valid claims against Edwin F. Huncker. After the foreclosure sales and the acquisition of record title thereunder Mrs. Huncker gave new notes and deeds of trust or otherwise took care of those obligations.

The record in this case is long, the abstract of record containing approximately 400 printed pages and containing many exhibits. Defendant Edwin F. Huncker testified and explained about the debts he owed when the notes of October 24, 1931, were executed. Plaintiff's evidence does not show that Huncker did not then owe the debts he claimed to owe (except as to the $12,000 and $2000 notes) or

that the other notes then executed went to parties other than to whom said Huncker owed bona fide debts. After careful consideration of this long record it appears to us the substantial question is whether or not Mr. Huncker was indebted to his wife, Louise, on October 24, 1931, in the sum of $14,000 (or more), so that there was a valid and adequate consideration for the $12,000 and $2000 notes and deeds of trust then executed. Regarding the $12,000 note there seems, as forecast above, to be some confusion, resulting, perhaps, from its being mentioned in two deeds of trust. But after considerable questioning and cross questioning at the trial the trial court stopped repetitious cross-examination with the remark that there was but one $12,000 note—a statement which we think the record fully justifies. There was but one.

The question of whether Mr. Huncker was indebted to his wife depends largely upon their testimony. Both testified. From their testimony the following facts appear: Mr. Huncker was 65 years of age at the time of the trial. He and said Louise were married in 1903. At that time Mr. Huncker was worth about $15,000. Said Louise then owned 85 acres of land which she had acquired from her father's estate. That was her separate property and so remained. It was very productive land. From 1915 to 1935 it was farmed by a Mr. Boschert as tenant on a crop rental basis, Mrs. Huncker receiving two-fifths of the crops produced, mostly wheat and corn. It appears that each year Boschert would sell the grain and other products and pay over the proceeds by check, settling with Mr. Huncker, who in that matter acted for his wife and deposited the money in the bank in her name. According to Boschert's testimony he thus paid as rentals, from 1917 to 1929, inclusive, somewhere from $14,200 to $15,300. He gave the approximate amounts, year by year, from memory. He was not asked and did not testify as to amounts paid in other years of his tenancy. [We mention these figures because it is contended by appellant that Mrs. Huncker could not have had the money which, as will later appear, respondents claim her husband got from her.] Appellant contends that Boschert's testimony is unbelievable—that an 85 acre tract could not produce so much income. Boschert's testimony is not without corroboration. Mr. Huncker testified as to the income received by his wife during those same years, refreshing his memory from memoranda or records he had kept, giving exact figures, and for the thirteen years, 1917 to 1929, inclusive, the amount totaled $15,202.78. Bank records introduced, showing deposits to Mrs. Huncker's credit, tend to support that testimony. Explanatory of the seemingly large income from 85 acres, we have stated that the land was very productive and during at least part of the time referred to grain prices were high. For example, Mr. Huncker testified that in 1917 wheat sold for $2.25 per bushel and corn for $1.92½ per bushel; that in 1918 wheat was $2.21 to $2.50 per

bushel and corn $1.75 per bushel. We recall that during those years grain prices were high. [The court declined to permit Huncker to go into detail as to prices in other years of the period covered by his testimony.] Bank records introduced tended to corroborate the oral testimony as to deposits made to Mrs. Huncker's credit during those years. She derived income from that farm prior to 1917, the amount of which is not shown.

Mr. Huncker testified, in substance, that from time to time he drew checks on Mrs. Huncker's account, using the money for his own purposes; that in 1917 he gave her a note for $2000 on account of moneys of hers thus used which, with interest, amounted to over $4600 on October 24, 1931. [Said note was, according to Huncker's testimony and checks shown, $544.40 less than he had withdrawn from her account.] He testified to other withdrawals, showing checks corroborating same, aggregating approximately $2400 for which he gave her his note for $2400 in 1919. Interest on this note to October 29th, 1934, amounted to $2,569.50. These are but illustrative items. He testified to many withdrawals by himself of money from Mrs. Huncker's bank account aggregating, if interest be allowed, considerably more than $14,000.

Referring again to Mrs. Huncker's separate means respondent's testimony shows that, beginning about 1925, Mrs. Huncker acquired certain corporation stocks which were eventually sold for $3515.77 and Mr. Huncker appropriated and used for himself the proceeds of that sale.

Summing up and without going further into detail, if Mr. Huncker's testimony, corroborated in many respects by checks and bank records, is to be believed, he owed his wife, at the time of the execution of the notes and deeds of trust here in question, in excess of $14,000. The moneys thus appropriated and used by Mr. Huncker from his wife's bank account were taken and used without her written assent.

Mr. Huncker's testimony indicates that for many years he had carried on extensive business operations and had acquired numerous properties, including bank stocks and perhaps other corporation stocks and the lands he owned on October 24th, 1931. He testified his "net worth" in 1929 was $150,000 but later said he lost some of his holdings and "in the fall of 1929 I was worth $100,000." During the years he was accumulating those properties he also borrowed heavily and in 1929 was largely indebted. In the late fall of 1929 the financial "crash" "got him." It appears from his testimony that he disposed of his various holdings and was able to and did pay his debts (aggregating some $100,000) excepting the debts hereinabove mentioned secured by the deeds of trust here involved. He still owed those debts and he still held the real estate covered by the deeds of trust.

Mrs. Huncker's testimony substantially corroborated that of her

husband as to receipts from her farm (though not in detail) and as to his use of her money. She said—"You see he had been borrowing all of this money ever since we were married, he got it, whenever the crops would come in he would need it, it seems he borrowed it, he bought something, and he needed it." Regarding the two notes of $2000 and $2400 which he had given her she said they had "a friendly little argument, not a family quarrel,"—but she insisted on having notes—"the thing was going on year after year," he was using her money, and she felt she was entitled to it—"it was a separate estate and I should have some of it," so at her insistence the notes were executed. She testified that when the notes and deeds of trust here involved were executed October 24, 1931, her husband actually owed her at least as much as $14,000—she said "fourteen or fifteen thousand dollars, I am not sure,"—none of which had been paid back to her.

Appellant first contends that the court erred in refusing to strike out, on his motion, the answers of defendants, Mr. and Mrs. Huncker, because of their refusal to answer questions on the taking of depositions. The cause, it appears, had been set down for trial for March 30, 1938, but the trial was actually begun April 1, 1938. On November 27, 1937, appellant took or attempted to take the depositions of Mr. and Mrs. Huncker, pursuant to notices theretofore served. Mr. and Mrs. Huncker appeared and each was sworn, but, on advice of counsel, refused to answer questions, except for a few formal questions as to residence, etc. Many questions were propounded seeking answers as to the business relations between Mr. and Mrs. Huncker, Mr. Huncker's indebtedness, and, generally, the bona fides of the notes and deeds of trust of October 24, 1931. All these the witnesses declined to answer (on advice of counsel)—on the ground that their answers might tend to incriminate them as they stood charged with fraudulent conveyance of property which (under certain circumstances), is a criminal offense. [Sec. 4098, R. S. 1929, Mo. Stat. Ann., p. 2899.] Appellant claims that under Section 1729, R. S. 1929, Mo. Stat. Ann., p. 4010, said defendants had complete immunity from any criminal prosecution, if they answered, because the acts denounced as criminal by Section 4098, supra, were misdemeanors and the Statute of Limitations had run against them. And he invokes Section 1730, R. S. 1929, Mo. Stat. Ann., p. 4010, which provides that if a party, on being duly summoned, refuse to testify in court or before a person authorized to take his deposition, besides being punished as for contempt "his petition, answer or reply may be rejected."

There might be some question as to whether said Section 1729 affords complete immunity, because plaintiff's petition charges not only fraudulent conveyance of the real estate but that Edwin F. Huncker still retained a secret interest therein and that after acquiring ostensible title Louise collected rents therefrom "which secretly belong to defendant Edwin F. Huncker . . . all of which are

part and parcel of the fraud herein alleged." Sec. 4098, supra, includes the conveyance or assignment of any interest in real estate, goods, chattels or things in action "or of any rents or profits issued therefrom, or to any charge upon such estate, interest, rents or profits," etc., made to hinder or delay creditors. If Edwin F. Huncker secretly retained an interest in the land and if Louise was collecting rents and profits which secretly belonged to Edwin F., the question might arise were they both not guilty of violation of the statute up to the time of the taking of the depositions,—she as well as he, because the statute makes any one privy to such fraudulent conveyance or assignment equally guilty with the conveyer or assignor. The question is interesting but we do not think it necessary to decide it herein.

Section 1730, supra, is not by its terms mandatory. It does not say "shall," it says the pleadings "may" be stricken. In Frankel v. Hudson, 271 Mo. 495, 506, 196 S. W. 1121, we said: "Refusal of a trial court to strike out the pleading of a party refusing to testify or give his deposition . . . is to be interfered with only in a case of a clear abuse of discretion. Appellate courts seldom hold such rulings erroneous." In Kaiser v. Gardiner (Mo. App.), 211 S. W. 883, 884 [5] it is said:

"While it is true the discretion of the trial court must be exercised with justice and wisdom, as affected by the facts and circumstances affecting the matter in hand, and while such discretion is open to review by an appellate court, yet the party seeking to substitute the discretion of an appellate court for that of the trial court must present a strong and clear case."

In the instant case plaintiff made no effort to have defendants Edwin and Louise compelled to answer questions propounded on their depositions or to have them punished for contempt for refusing to answer. He elected to stand on his supposed right to move to have their answers stricken at the trial. The court refused to strike the answers. At the trial they both testified fully and so far as we can see from the record without attempt at reservation or evasion. We are unable to see from the record before us that plaintiff was prejudiced by said defendants' refusal to answer questions on the taking of their depositions. We do not mean to say that their conduct on that occasion is to be commended or that it is safe procedure. Had the trial court stricken the answers we are not saying we could condemn such action as an abuse of discretion. But the court did not do so. It had the witnesses before it. In circumstances such as those before us we think the trial court must be allowed some discretion, to be of course soundly and wisely exercised and subject to review. In the instant case we cannot say the court abused its discretion. This point is ruled against appellant.

██ The burden to prove fraud is upon the party alleging it. [Bank of Brimson v. Graham, 335 Mo. 1196, 1209, 76 S. W. (2d) 376,

382-3, [10-11].] Under state law (bankruptcy proceedings not being here involved) a debtor has the right to prefer certain creditors, if the transaction is in good faith, Sexton v. Anderson, 95 Mo. 373, 8 S. W. 564, even though the effect of the transaction may be to hinder and delay other creditors. [Kincaid v. Irvine, 140 Mo. 615, 41 S. W. 963.] [4] And this is so even though the preferred creditor be a relative or member of the family of the debtor. [Stahlhuth v. Nagle, 229 Mo. 570, 583, 129 S. W. 687.] "So long as there is no fraud in the transaction, a debtor in failing circumstances may prefer his kinsman, who is his creditor, as well as a stranger. *While a court of equity will scan the transaction with jealous eyes, preference and relationship alone will not afford sufficient evidence of fraud.*" (Italics ours.) [Stahlhuth v. Nagle, 229 Mo. supra, l. c. 583.] And in the case of husband and wife, while transactions between them to the prejudice of the husband's creditors are looked upon with suspicion "and their good faith must be so clearly shown that there can be no reasonable doubt of the honesty of the transaction," yet "if the wife is a bona fide creditor of her husband, he has a legal right to, in good faith, prefer her over his other creditors." [Friedel v. Bailey, 329 Mo. 22, 30-31, 44 S. W. (2d) 9, 11 [1-4].] And it was in effect held, in Winn v. Riley, 151 Mo. 61, 52 S. W. 27, that where a husband, without his wife's written assent, has appropriated the wife's money to his own use, she may treat him as a debtor rather than as a trustee. In this case she treated him as a debtor.

There are some other points raised by appellant which we do not deem it necessary to discuss. After careful examination and consideration of the record we think the judgment should be affirmed. It is so ordered. *Westhues* and *Bohling, CC.*, concur.

PER CURIAM:—The foregoing opinion by COOLEY, C., is adopted as the opinion of the court. All the judges concur.